Our second case for argument is Mohr v. McNeil Automotive Products. Ms. Mandel May it please the Court, my name is Meredith Mandel and I represent Appellant Sharesse Mohr v. WeatherTech, and I'm here to ask this Court to reverse the District Court's grant of motion for summary judgment for Defendant WeatherTech and remand this case For Defendant who? WeatherTech Is WeatherTech a juridical entity? What is it? It is a corporation. It's a corporation? It does not have a corporate identifier in its name. It's a company. So what is it? It's an employer. I could not find out that it was anything other than a trademark, right? The Defendant identifies in its own brief McNeil Automotive Products Limited as the only thing that looks like a juridical entity. So we're referring to the Defendant as WeatherTech? You cannot sue a trademark. That's perfectly straightforward. Understood, Your Honor. So what is WeatherTech? You obviously don't know, do you? It's a company. It's a company. So where is it registered as a company? In Illinois. You obviously don't know the answer to this. Well, we'll see whether Mr. Sharm does. Please proceed. Point one, there's a reasonable inference. Appellant Moore meets her prima facie burden under McDonnell Douglas. First, she's a member of a protected class. Two, she had a specific agreement with her direct supervisor that she could text her and be late or have unscheduled absences and make up that time at another time. She also had good performance reviews, and so we believe there's a reasonable inference that can be made that she was meeting her legitimate employer's expectations under McDonnell Douglas. Three, she suffered an adverse employment action. She was fired. And four, the record shows that a similarly situated individual, William Heisler in this case, a white male and a customer service rep who had the same position she did and the same supervisor, was treated more favorably. He was tardy in the two-year period that our expert analyzed more than 250 times, and it was noted in his performance review looking back at 2016. And he was not fired. He was promoted. And so when he was tardy 423 times in comparison to Moore's, how many times was she tardy? So for the two-year period for 5 to 20 minutes, it was 183 times to 250. I have 380. So it was just a 5 to 20-minute time period, and that's kind of what I was focusing on. I can go back and look at the expert report and give you an answer on rebuttal, but the 5 to 20 minutes was 250 times versus 180 times. For the same time period? Yeah. And so we have 380 times for her and 423 times for him when we're looking just at tardies within that two-year period. Were both of those individuals warned about being tardy? So in the record, we do have evidence that she was warned. However, she was also told that her absences were excused and that her tardinesses were excused. So there's contradictory evidence in the record about that. And so I just want to make sure that you understood the question. Were both of those employees, the comparator and the Ms. Moore, were they both warned about their excessive tardiness? So we see in the comparator, Mr. Heisler, the white male's performance review from 2017. Looking back at 2016, that tardiness was an issue, and that was discussed with him. All right, so both of them were warned about the tardiness. So let's move then to the absences. How does Heisler compare? Is he a comparator to Mrs. Moore in regards to absences? So in that situation, we think that the absences that Mr. Heisler, he had fewer absences, that's true, but you don't need an identical comparator when looking at comparators in the Seventh Circuit. You just need a meaningful comparison. And something that's a key— What we're trying to drill down here is whether or not these two individuals were treated differently. So that's why I'm trying to figure out where or in what aspect, looking at the employment policy, they were treated differently. So let's back up for a moment here with the absences. Approximately how many absences are we comparing between the two? So, for example, in the two-year period, Mr. Heisler had four. She had 15. That was analyzed by our expert. What I have to say, with respect to whether techs own employment— Now, I have Heisler missing 10 days within the two-year period, and I have Mrs. Moore missing 34 days within that same period. So there are different numbers and different ways to slice it, but in the expert report, there is one comparison for— I'm sorry, for one year, the last year in which she was fired. It was four days versus 15. If you're looking at the entire two-year period, then I apologize. You're correct on her. I was just focusing on the last year of when she was fired, 2016. Okay. And so within trying to determine whether or not he's a comparator, at any point, did Mr. Heisler miss seven days within a 30-day period? Looking at the expert report. He did not miss seven days within the 30-day period, but those were excused absences. All right. And that's where the contradiction is. They keep on saying, oh, it's a no-show, it's a no-show. But the text message history and the relationship between her direct supervisor, who, according to the employee handbook, was responsible for scheduling her, kept on telling her in those last seven to 30 days, oh, you're sick, oh, your flight was canceled due to bad weather, oh, your car was repossessed. The day before she was fired, that's a valid excuse. So there are obvious contradictions in the record, which we think raises an inference that this is pretextual, this seven out of 30 days. And with regard to the employment handbook, it considers of equal seriousness tardiness and absence. WeatherTech's own employment handbook considers them of equal seriousness. If you look at page 29 of the handbook. And so our point is, WeatherTech now is just trying to say, oh, the seven out of 30 days, that's the post hoc justification for why we fired her. But we think that raises some pretextual, that's a pretextual excuse here. With regard to Hessler, say he is a comparator. Don't we have an issue that we just don't see how his story plays out? Because he gets a written warning. You're right, you referenced that in 2017, looking back at 2016. And that one notes it's his second strike, which implies that he's been warned before. Then he resigns six weeks later. So we don't have Hessler staying in the picture to see how many more warnings is it going to take or instances before they fire him because he resigns. With Ms. Moore, they note her attendance issue in the 2014 evaluation. She gets a warning in 2015 June. She gets another warning in 2015 June. She gets another warning in November 2015 about tardiness. Then she has her 2015 evaluation in December. That notes tardiness and absenteeism. Then she's fired in 2016. I want to know from you, how does it impact how we look at the two of them when he exits stage left six weeks after his written warning? She persists in the job and has these several more warnings. Well, I think we have to look at the time period when they were both employed there. That's the relevant time period. I understand that we want to see, ideally, what happened ultimately to him. But they didn't fire him in the time period that he was there. They didn't fire him after his, quote-unquote, second strike. They didn't fire Ms. Moore after her second strike either. Well, they also gave a lot more attention to Ms. Moore, and that's one of our issues that we raise, why she was treated differently. There's no evidence in the record that he had to constantly text his supervisor, even though there is evidence that he was frequently late. She constantly had to—she was under the microscope with her supervisor. She constantly had to text. I wanted to ask you about that too. What information do we have about the contours of her agreement with her supervisor? It's in her deposition testimony. The supervisor admits that she had an agreement with Ms. Moore and that Ms. Moore basically was allowed to text and say when she was going to be tardy or not going to be late, and we also have text evidence showing that she did that. And her supervisor said, okay, give me a day of unpaid time or you can make it up at a later shift. And that was kind of the general flexibility. I think that's a key issue that you don't see in other case law or prior cases in the Seventh Circuit where you have the employer basically saying, it's okay, you can make this time up at another time. We have flexibility here. And so your argument is she had that flexibility with her supervisor. Now, Hessler, we don't have any evidence about whether he had a similar arrangement, but you're saying also because she had that arrangement, she was under the microscope more than Hessler? Yes, and I'm also saying that just reflects that there are a lot of contradictions in the employer's story, which raises pretextual issues. So I'll get back to the point about the 7 out of 30 days. WeatherTech will tell you or the defendant will tell you that those no-shows were not considered excused, but the record evidence and the text message relationship shows that even the day before she was fired and her car was repossessed, WeatherTech was telling her, her supervisor was telling her that that's a valid excuse. The fact that Ms. Moore's supervisor fired her in a fit of emotion, later called her a calculated liar the day before she was fired, she was telling her she had a valid excuse, I think raises some concerns about whether or not this proper reason for the firing, the legitimate reason, the 7 out of 30 days, was really the reason she was fired. When you're telling your employee all along your absences are excused and then you fire her, that sort of sudden reversal raises a question of whether or not the 7 out of 30 days is pretextual. Lastly, I'd like to just mention the district court. Pretextual that it's the pretextual that it was discrimination based on race? Yes, because we have an adequate comparator. And then in addition to the adequate, where we show that the white male... We're beyond the prima facie case. So under... If you tell me as the employer why you're late to work, the next day I learn that the reason that you gave me is false. And I terminate you based on the misrepresentation. What is the pretext? So that's not the reason why she was terminated here. Because the next day, the 7 out of 30 days... Going back to your argument that you just made to the court, that she gave reasons for being absent and all of those reasons were excused. Yes. And your representation is that was pretext. My representation is that the employer's reasoning that the last 7 out of her 30 days she was absent was the reason for her firing. I'm saying that the employer's proffered reason is pretextual. And I'm saying that the employee... Because of the employer's contradictions in the record, I think that raises triable issues of fact about whether that proffered excuse, the reason that they fired her the 7 out of 30 days, was actually the real reason and not racial discrimination based on the fact that they treated the white male Caucasian employee who was similarly situated and who never showed up to work on time. They didn't fire him. They promoted him and gave him a raise. Hassler left. Well, eventually he left, but he was promoted when she was there and when she was fired. I'm going to reserve some time for rebuttal.  Certainly, counsel. Mr. Schaum. Mr. Schaum, what is WeatherTech? May it please the Court, Your Honor. WeatherTech is, when we were sued, it was McNeil Automotive Products Limited, an Illinois company. It demerged in 2001 to WeatherTech Direct LLC, which is an Illinois LLC. I'm sorry. Could you slow down and raise your voice? Sure. My apologies. WeatherTech was formerly known as McNeil Automotive Products Limited. This is a 2017 case, and that's an Illinois company. It demerged into what is now WeatherTech Direct LLC, an Illinois LLC. So your statement of interest in your brief is unambiguously false. You have to tell us who the party is now, and you're now giving us a name that is neither of the two names in your certificate of interest, which says the party is McNeil Automotive Products, a.k.a. WeatherTech. My apologies, Your Honor. We have to conduct conflicts checks in these cases. We can't do it if the lawyers are not providing accurate and current information. My apologies, Your Honor. I thought it was. An apology will not suffice. You need to file a correct statement of interest immediately after argument. Yes, Your Honor. Counsel just raised an important point as she ended, which is? Why was Ms. Moore terminated? For missing 7 days out of 30. 30. Your Honor, you asked the question, how many days did Heisler miss? He didn't miss 7 days out of 365. Ms. Moore was terminated because she couldn't be counted on to show up for work. Ms. Strelzak, her supervisor, hired her. She worked with her. The only thing in the record at all that mentions anything about race was a text between Ms. Moore and Ms. Strelzak where Ms. Moore was saying her daughter was being harassed in the neighborhood. Ms. Strelzak's response, that's horrible. She was counseled on her first. She said, look, we've got to work on your attendance. It's been a problem. On her next performance review, she said, we have to work on your attendance. It's a problem. Your personal issues are getting in the way. We need to put work first. Is it inconsistent for the employer to say that in these annual performance reviews that she's meeting expectations yet note that she had attendance issues? Not at all, Your Honor. She was meeting expectations when she was there. If she was merely tardy, she would probably still be working for WeatherTech. Ms. Strelzak said that. But she just couldn't be counted on to be there when she was scheduled. And to your point, Judge Pryor, where you were saying, how does that get to pretext? It doesn't. Just because Ms. Strelzak thought she was getting false excuses or lies or she wasn't really trying to come into work, it has nothing to do with discrimination. She just thought she was making up stories. I have to go back to my question because, as you know, if we choose to analyze this under McDonnell Douglas, we have to answer this question, was she meeting her employer's legitimate expectations? Ms. Moore is able to say, my performance reviews actually say I was meeting expectations. Yet they also note, of course, as we all know, that she had attendance issues. How do we thread that needle? Well, I think you can go straight to the Wagner case, which says, obviously, attendance is the legitimate expectation of an employer. When she was there, her performance as a customer service representative was meeting expectations. The problem was being there. You have to be in the seat. Even if she was 5 or 10 minutes late, she would still be there to cover the shift. But if she's not covering the shift, eventually it's got to give. And rather than getting better, rather than, you know, as they're trying to talk and work this out and figure out how the attendance is going, it got much worse. I mean, the irony of this case is that Ms. Strelzick is practically begging Ms. Moore to come into work. She wants her there. But eventually she's got to have somebody that's going to cover the shift. And I don't think Eisler is a proper comparator because he's there. Now, both Ms. Moore and Eisler were tardy. I mean, there's no question about that. But he would be there when scheduled. And that's the most important thing. You have to have an employee there to cover the shift. And another thing. The 7 out of 30 days reason for Ms. Moore's termination was not post hoc. Ms. Strelzick writes that in the messages. She's like, you know, I want to believe you, but I can't take these stories anymore. You know, you have now had seven, more than a full work week in a month where you haven't shown on your scheduled shift. So, unfortunately, we have to terminate your position. That's not post hoc. That's not in briefing years later. That's happening right now. You know, I think the text messages, back and forth, they're so voluminous, show a caring, kind supervisor who tried to give Ms. Moore every chance possible. Let me ask you the same question I asked Ms. Mandel. What do we have in the record about their agreement? Strelzick and Moore. Nothing. I mean, I guess I would say there's no real agreement, but taking plaintiff's allegations is true. Ms. Strelzick tried to work with all of her employees. She just needed them to be there. And what do we have in the record about Heisler working a full shift after he's late? There is a point in your briefs where you say, yes, he was late, but when he came, he would then work a full shift. But I don't see that. You cite a table from the export report about no-show absences, but it doesn't tell us if he put in a full shift after he was tardy. Yes, Your Honor, that's from the export report where it has the number of days. And I believe for the two years, as Judge Pryor pointed out, it was four and five for the entire year. So although he had more tardies, he did not have the same number of no-shows. Otherwise, it would have shown up in the other table. So that's the district court looked at that. Yeah, no, I'm asking about when he was tardy, and he would show up, would he then complete the missed time? Would he work a full shift? Yes, and you can see there are many different tables that go into that, but yes, basically that's what happened. I'm saying where in the record is that? Do we see that? I think it's Table 8 or Table 7 because they show how long the shifts were that they worked when they showed up. So you can move from one to the other. But... If we conclude that Heisler is a comparative, both, after all, had attendance and tardy issues, and Ms. Mendell has made the point that we don't require clones. Our case law is clear. We don't require exact matches. Do you still win? I think so, Your Honor. I think the record is completely bereft. I mean, the only reason we get to... The factual record is completely bereft of anything. If anything, it cuts the other way, showing compassion, no discrimination whatsoever. The only reason you get to that is the expert report, but as the district court considered the expert report and looked at that, she's like, yeah, that supports the reason. There's almost like two layers you have to get past to even get to pretext. So yes, I believe so, Your Honor. Thank you. I would say, if there are no further questions, in conclusion, Your Honor, this case has been pending for eight years. Ms. Moore was appointed very diligent, very competent counsel. We've turned over every stone, and there's just no evidence of any discrimination whatsoever. I would respectfully submit that the evidence cuts the other way. It's been incredibly costly for the company to defend this case, and we've done so for one principled reason. We did nothing wrong. We try to work with Ms. Moore. We respectfully ask that you affirm the district court. Thank you. Thank you, counsel. Ms. Mandel, anything further? You have 46 seconds, which I'll round up to one minute. Thanks. I just want to quickly refer to the employee handbook again and quote it. Excessive absenteeism or tardiness or any absent without notice is a violation of the employee handbook. There are tantamount in the employee handbook. And so now to say it's not a valid comparator is a contradiction that should be made clear. I think the district court misapplied Ortiz v. Werner. They didn't look at the entire record. They didn't look at the agreement that was struck, which is quite unusual here, allowing her to make up the time if she was later absent frequently. And the text message history really is critical evidence in this record. Thank you. Thank you very much, counsel. The case is taken under advisement.